UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:08-cr-26 |
| | § | |
| REGINALD QUINCY MCCOY | § | |

### MEMORANDUM AND ORDER

Defendant Reginald Quincy McCoy has brought a Motion to Dismiss Indictment Under the Speedy Trial Clause of the Sixth Amendment to the United States Constitution. (Doc. No. 17.) The motion has been the subject of an evidentiary hearing and the argument of counsel. After considering the parties' arguments, the evidence presented, and the applicable law, the Court finds that Defendant's motion must be **GRANTED**.

### I.   BACKGROUND

McCoy is presently charged in a one-count indictment filed on January 23, 2008, with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Indictment, Doc. No. 1.) Specifically, the indictment alleges that, on June 27, 2006, McCoy was a convicted felon who knowingly possessed a Hi-Point .40 caliber pistol. (*Id*.) McCoy has moved to dismiss the indictment, arguing that his Sixth Amendment right to a speedy trial has been violated due to the nearly five year delay from the date of McCoy's alleged violation of 18 U.S.C. § 922(g)(1) to his trial. (Doc. No. 17.) The Court will summarize the key facts bearing on the Sixth Amendment speedy trial inquiry before turning to its analysis of the issue.

On May 10, 2006, the Houston Police Department ("HDP"), working in conjunction with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), pulled over a maroon Ford

Taurus on the 7500 block of Creekbend Drive in Houston, Texas. (Tr. 5:23-6:12.) McCoy, the driver of the vehicle, was arrested for failure to identify himself to a police officer, as well as for outstanding traffic warrants. (*Id*. at 5:16-8:6.) After McCoy was transported to jail, ATF Agents Gaetano Beato and Blaine Gillis ran McCoy's criminal history and found information that led them to believe McCoy was on federal supervised release in Louisiana, and that he was in violation of the terms of that release. (*Id*. at 8:8-12; Govt. Ex. 4.) Agent Gillis subsequently contacted federal officials in Louisiana and, on June 23, 2006, secured a copy of an arrest warrant for McCoy's violation of supervised release. (*Id*. at 9:5-8; 9:15-24.) On June 27, 2006, with a copy of the supervised release arrest warrant in hand, Agent Beato went looking for McCoy in the area where he was arrested on May 10, 2006. (*Id*. at 9:9-14.) In a marked HPD vehicle, Agent Beato and an HPD Task Force officer searched the area around 8080 Creekbend Drive, the address McCoy gave when he was arrested the previous month. (*Id*. at 10:3-13; 11:1-3.)

Agent Beato soon spotted McCoy speaking to a black male outside the Braeswood Apartment building at approximately 8100 Creekbend Drive. (*Id*. at 10:14-24; 27:15-19.) Agent Beato exited the vehicle in pursuit of McCoy. (*Id*. at 11:6-10.) Agent Beato testified that the apartment building was run down and many of the units were abandoned, so he was afraid McCoy would flee into one of the units and the officers would have to go in and get him. (*Id*. at 11:9-14.) Agent Beato and HPD Task Force Officer Darrell Smith, however, were able to apprehend McCoy and arrest him after a brief struggle. (*Id*. at 11:15-22.) In searching McCoy after his arrest on the warrant for violation of supervised release, Agent Beato testified that the officers found a .40 caliber High-Point pistol in McCoy's back pocket. (*Id*. at 12:6-16.) During McCoy's apprehension and arrest, a crowd of tenants gathered around McCoy and the officers.

(*Id*. at 28:12-18.)  The officers did not take down the names of any of the witnesses. (*Id*. at 28:19-22.)

Agent Beato testified that McCoy was given *Miranda* warnings and questioned at the Fondren police station roughly forty-five minutes after his arrest.  (*Id*. at 12:23-13:1; 29:1-2.) During that interview, McCoy informed Agent Gillis that he had taken Ecstasy and marijuana that day.  (*Id*. at 29: 3-12.)  McCoy then gave an incriminating statement in relation to his possession of a firearm.  (*Id*. at 13:11-25.)  McCoy was transferred to the Federal Detention Center in Houston, Texas, in connection with the supervised release warrant on which he had been arrested.  (*Id*. at 14:7-12.)  Agent Gillis, who was the ATF case agent at the time, subsequently contacted the United States Attorney's Office and asked Assistant United States Attorney ("AUSA") Richard Harris whether the office would consider filing charges against McCoy for possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (*Id*. at 14:13-19.) Agent Gillis submitted a case report recommending McCoy's prosecution to AUSA Harris on July 19, 2006, but no charges were filed at that time.  (*Id*. at 14:20-25; Govt. Ex. 4.)  Agent Gillis understood that the United States Attorney's Office accepted the case for review for prosecution. (*Id*. at 53:4-6.)

After his arrest on June 27, 2006, McCoy was transported to New Orleans, Louisiana, for proceedings related to the revocation of his supervised release.  (*Id*. at 15:5-13.)  His supervised release was, indeed, revoked, and he began serving a sentence in federal prison in Forest City, Arkansas.  (*Id*. at 59:5-16.)  When McCoy's case came up for review within ATF in October 2006, no action had been taken by the United States Attorney's Office.  (Govt. Ex. 4.)  ATF agents subsequently followed up with the United States Attorney's Office on several occasions to determine the status of McCoy's potential prosecution.  Specifically, on March 21, 2007, nine

3

months after McCoy's arrest, Agent Gillis discovered that AUSA Harris, the attorney assigned to the case, had retired and that McCoy's case file had been lost at some point prior to Harris' retirement. (Tr. 61:4-14; Govt. Ex. 4.) Following AUSA Harris' retirement, the case had been referred to AUSA Melvin Pechacek. (*Id*. at 61:13-14; Govt. Ex. 4.) AUSA Pechacek contacted Agent Gillis on March 21, 2007 and stated that he remembered the case being referred to him from AUSA Harris, but that he "had not gotten to it." (Govt. Ex. 4.) On March 23, 2007, AUSA Pechacek stated to Agent Gillis that he planned to review the case sometime in the following week. (*Id*.) In June of 2007, McCoy's case again came up for review within ATF and Agent Gillis contacted AUSA Pechacek for a second time to follow up regarding McCoy's potential prosecution. (Tr. 61:22-62:2; Govt. Ex. 4.) AUSA Pechacek informed Agent Gillis that he had been "busy with other cases," but that he did intend to indict McCoy in July 2007 once he returned from vacation. (Govt. Ex. 4; Tr. 62:3-7.) In July 2007, Agent Gillis followed up with AUSA Pechacek regarding the potential of indicting McCoy that month. (Govt. Ex. 4.) AUSA Pechacek related that, since he returned from vacation, he had three Alien Smuggling cases going to trial, as well as several Laredo cases assigned to him, but that he was hoping to have McCoy indicted towards the end of the month. (*Id*.) McCoy was not indicted in July, and on August 20, 2007, Agent Gillis again contacted AUSA Pechacek regarding the case's status. Agent Gillis received a response stating that AUSA Pechacek needed to go over the file again to refresh his memory as to the facts of the case and would see about scheduling a grand jury date. (*Id*.)

When McCoy still was not indicted by December 2007, ATF's Assistant Special Agent in Charge contacted the Deputy Chief of the local United States Attorney's Office to determine the status of the case. (Tr. 62:12-19; Govt. Ex. 4.) Apparently in response to this inquiry, on

4

January 23, 2008, almost nineteen months after the events underlying the crime allegedly occurred, the United States Attorney's Office filed an indictment against McCoy for violating 18 U.S.C. § 922(g)(1). (Doc. No. 1.) On January 26, 2008, the warrant for McCoy's arrest on the federal indictment was entered into the National Crime Information Center ("NCIC") database. (Tr. 31:6-10; Govt. Ex. 4.)

After McCoy's indictment, Agent Gillis attempted to put a federal detainer on McCoy with the Bureau of Prisons, but discovered that McCoy had been released from the federal detention center in Arkansas at the end of November 2007. (Tr. 54:12-14; 62:23-25.) Agent Gillis "did some database queries" to find information about McCoy's whereabouts, but the information contained in the databases had not yet been updated since McCoy's release from prison. (*Id*. at 54:14-22.) A year and a half had passed since agents last made contact with McCoy and ATF had no fixed address for him, so on approximately February 27, 2008, Agent Gillis made an attempt to locate McCoy on Creekbend Drive by driving down the street. (*Id*. at 54:4-22.) Agent Gillis testified that the area around where McCoy was arrested on June 27, 2006 still looked roughly the same as it did the day McCoy was arrested. (*Id*. at 64:13-21.)

The same day, Agent Gillis provided HPD task squad District 19 with McCoy's photograph and biographical information. (*Id*. at 54:23-55:3.) HPD District 19 officials advised Agent Gillis that they would pass the information along to the District 17 sergeant because Creekbend Drive was located in that jurisdiction. (*Id*. at 55:3-7.) After that, Agent Gillis did not do anything else to attempt to locate McCoy. (*Id*. at 55:12-15.) In April 2008, Agent Gillis transferred to another ATF office and Agent Beato assumed Gillis' duties on the McCoy case. (*Id*. at 15:14-22.)

Agent Beato went to the apartment building at 8080 Creekbend Drive where McCoy last

stated he lived. (*Id*. at 15:23-16:1.) Agent Beato came in contact with the manager who did not have any information on McCoy. (*Id*. at 16:1-10.) Subsequently, Agent Beato performed database checks on McCoy to "see if anything linked to his name," and he discovered that McCoy had been arrested by HPD on December 18, 2007 for possession of marijuana at 11900 Beechnut Street in Houston, Texas. (*Id*. at 16:8-18.) In April of 2008, Agent Beato went to the 11900 Beechnut Street address to look for McCoy, but did not find him. (*Id*. at 16:19-22.) Agent Beato also attempted to locate McCoy at 14900 Harwin Drive, Apartment No. 1505, but he discovered that the address did not exist. (*Id*. at 16:23-25.)

In May of 2008, Agent Gillis received an email from a federal agent in Louisiana, informing him that McCoy's mother, Regina McCoy, was inquiring about warrants related to her son. (*Id*. at 55:17-24.) Agent Gillis forwarded the message to his former supervisor in Houston. (*Id*.) On May 9, 2008, Agent Beato received an email advising him that McCoy's mother would like an ATF agent to call her concerning her son. (*Id*. at 17:5-8.) Agent Beato called the number with which he was provided. A woman answered and identified herself as Regina McCoy. (*Id*. at 17:8-9.) The woman explained that she was attempting to obtain funding from the Social Security Administration, but that she was informed she would be unable to do so because of an outstanding arrest warrant for her son, Reginald McCoy. (*Id*. at 17:9-13.) Agent Beato testified that, during the phone call, he explained to Regina McCoy the reason for the arrest warrant and stressed the importance of providing ATF with her son's location. (*Id*. at 17:13-16.) Regina McCoy responded that she did not know her son's exact location, but she did tell Agent Beato that she thought McCoy was in Houston with his girlfriend, Tanya McMillan, with whom he had a child. (*Id*. at 17:17-18:3.)

Agent Beato then attempted to locate McCoy through his girlfriend. He ran the name

6

"Tanya McMillan" through a database and found the name "Jotanya DeShawn McMillan." (*Id.* at 18:4-7.) Agent Beato searched for vehicle information associated with McMillan and then ran the license plate numbers he found to see if McCoy "came back to any of her vehicles." (*Id.* at 18:8-10.) Agent Beato testified that the information he found did, in fact, connect McCoy to a vehicle registered to McMillan. (*Id.* at 18:11-14.) Another database revealed McMillan's address was 4040 Synott Road. (*Id.* at 19:25-20:2.) Sometime in May 2008, Agent Beato visited that address and discovered that neither McMillan nor McCoy still lived there and that the apartment manager had no forwarding information. (*Id.* at 20:3-13.) The only other address Beato knew of for McMillan was 1620 Enclave Parkway, the address listed on her driver's license. (*Id.* at 20:14-19.) Agent Beato testified that he could not remember whether he went by the Enclave Parkway address. (*Id.*)

In August 2008, Agent Beato discovered that, on March 25, 2008, McCoy was stopped by HPD and told the HPD officer that his address was 1455 Lakeside Estates. (*Id.* at 20:20-25; Govt. Ex. 4.) Although McCoy had already been indicted and the warrant was entered into NCIC, HPD apparently did not notify ATF or arrest McCoy when it stopped him. (*Id.* at 44:5-18.) Agent Beato did not know whether he visited the Lakeside Estates address McCoy provided, but speculated that, if he had the address at the time, he was "pretty certain" that he would have gone looking for McCoy. (*Id.* at 21:1-4.) On March 3, 2011, the day of the evidentiary hearing in this case, Agent Beato discovered that a car associated with McMillan had warrants for McCoy tied to it at the time ATF was looking for McCoy in 2008. Somehow, Agent Beato did not discover this information in 2008; it was not until he contacted an HPD officer in preparing for the evidentiary hearing that he learned of the warrants. (*Id.* at 44-46.)

After taking almost no action on the case after August 2008, in March 2009, Agent Beato

7

approached Justin Perusich, a deputy with the United States Marshals Service, about assisting with the search for McCoy. (*Id.* at 65:17-24.) Deputy Perusich began his investigation by checking to see if McCoy was in custody and running several other database checks. (*Id.* at 66:2-9.) He then visited various addresses looking for information about McCoy. First, he went to 10950 Briar Forest in Houston, Texas. (*Id.* at 66:10-17.) No one at the address remembered McCoy. (*Id.*) Second, he visited 4040 Synott, one of the addresses Agent Beato previously visited. Deputy Perusich testified that "they, obviously, had already left." (*Id.* at 66:15-22.) Deputy Perusich was also unable to obtain a tenant file on McCoy from the management at the Synott address. (*Id.*) Third, Deputy Perusich visited 1201 Wilcrest, an address associated with McMillan, but after periodically conducting surveillance outside of the building, he concluded that neither McCoy nor McMillan lived there. (*Id.* at 66:21-67:20.) Deputy Perusich also checked into a P.O. Box in Louisiana that had been associated with McCoy historically, but it turned out not to belong to him. (*Id.* at 69:3-8.) Deputy Perusich did not testify to any other actions he took in pursuit of McCoy. (*Id.* at 75:10-14.)

     Nearly one year later, on May 17, 2010, Deputy Perusich received notification that McCoy had been arrested in Houston, Texas. (*Id.* at 69:12-15.) The same day, the United States Marshals Service placed a federal detainer on McCoy. (*Id.* at 70:6-14.) Despite the detainer, at some point later, Texas state authorities sent McCoy to the Texas Department of Criminal Justice without notifying the United States Marshals Service. (*Id.* at 70:19-71:2.) On December 15, 2010, after being prompted by the United States Attorney's Office, Deputy Perusich looked into McCoy's whereabouts and then filed another federal detainer with the Texas Department of Criminal Justice. (*Id.* at 70:24-71:9.) After receiving notice of the detainer, the Texas Department of Criminal Justice released McCoy into the United States Marshals Service's

custody on December 30, 2010. (*Id*. at 70:10-16.) McCoy asserted his speedy trial rights as soon as he appeared in court on the indictment.

Casey Collins, a chief investigator with the Federal Public Defender's Office for the Southern District of Texas, testified regarding his efforts to locate witnesses who were present at the time McCoy was arrested in June 2006. Collins testified that he visited the apartment complex where McCoy was arrested at 8100 Creekbend Drive to see if he could find anyone who witnessed McCoy's apprehension and arrest or the man who was speaking with McCoy when Agent Beato first spotted him. (*Id*. at 78:5-9.) Collins discovered that the apartment complex was under new ownership and had undergone considerable physical changes since June 2006. (*Id*. at 78:10-79:9.) Since that time, the apartment complex had been emptied out and a complete rehabilitation of the facility was performed. (*Id*.) The management company representative with whom Collins interacted did not have a tenant list or any other tenant information from the previous owner. (*Id*.) In addition to searching for witnesses, Collins investigated McCoy's whereabouts during the time period from his indictment to his arrest. By contacting McMillan, Collins discovered that McCoy had been employed in Houston, Texas, at Bonner Sheet Metal & Roofing and Building EMT's, LLC, during that time period and that he had filed taxes. (*Id*.)

McCoy argues that the federal firearm charge against him should be dismissed due to the unreasonable delay in bringing him to trial. McCoy argues that three years is an extremely long delay, chargeable solely to the Government, and that the Government's long delay in bringing him to trial has caused him actual prejudice in mounting a defense. Even absent actual prejudice, McCoy argues that prejudice should be presumed because of the length of the delay and the fact that the Government is solely responsible for it.

To support the argument that actual prejudice exists, McCoy points to the fact that the

crime scene itself has changed considerably and that no witnesses can be located since the apartment complex was purchased in 2008 and tenant contact information is no longer available. In addition, when McCoy gave a statement to the ATF agents after his arrest, he admitted to using substances, including Ecstasy and marijuana, earlier in the day. Due to the unreasonable passage of time, McCoy argues, he is unable to contact any of the witnesses who could testify as to his state of mind when he gave the incriminating statement. The Government's sole counterargument to McCoy's assertion of prejudice is that McCoy "cannot establish prejudice in light of his written concession statement." (Govt. Mot. at 8.)

## II.   ANALYSIS

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. "The right to a speedy trial 'attaches at the time of arrest or indictment, whichever comes first, and continues until the date of trial.'"[1] *United States v. Neal*, 27 F.3d 1035, 1042 (5th Cir. 1994) (citing *United States v. Garcia*, 995 F.2d 556, 560 (5th Cir. 1993)). Courts examine four factors to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992) (citing *Barker v. Wingo*, 407 U.S. 514, 530

---

[1] "The sole constitutional limit on the delay between the commission of a substantive offense and the initial accusation based on that conduct is the due process clause." *United States v. Avalos*, 541 F.2d 1100, 1107 (5th Cir. 1976). To demonstrate that pre-indictment delay violates the due process clause "it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose." *United States v. Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996). As discussed *supra*, there is no evidence that the Government intentionally delayed McCoy's indictment in order to gain a tactical advantage in his prosecution. The pre-indictment delay, therefore, does not violate due process. The Court's analysis will focus solely on whether the post-indictment delay violates his Sixth Amendment right to speedy trial.

10

(1972)); *United States v. Bergfeld*, 280 F.3d 486, 488 (5th Cir. 2002).

"The first of these [factors] is actually a double enquiry." *Doggett*, 505 U.S. 651. First, in order to even initiate a speedy trial analysis, "an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Id*. at 651-652. In the Fifth Circuit, a post-accusation delay approaching one year is generally sufficient to trigger a speedy trial analysis. *See Bergfeld*, 280 F. 3d at 488. Second, once a defendant has made a showing that the delay experienced has reached the appropriate threshold, a court is required to examine the other factors in the test, including "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. "This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id*. The longer the delay, generally, the more heavily this factor is weighed against the Government.

The indictment against McCoy was filed on January 23, 2008 and trial is currently set for March 2011—a delay of more than three years. Thus, the delay has extended three times longer than the minimum necessary to trigger judicial examination of McCoy's claim. The extent of the delay and the weight of the other two factors will be examined below in relation to the prejudice suffered by McCoy.

The second prong of the test analyzes the reasons for the delay. In *Barker v. Wingo*, the Supreme Court implicitly placed the burden on the Government to give a justifiable explanation for the delay in a speedy trial claim. 407 U.S. at 531 (analysis of delay focusing on reason Government claimed justified delay). All of the circuit courts that have evaluated the reason for the delay element of the speedy trial analysis have held that the burden to explain the delay rests

on the Government.  *See, e.g.*, *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (citing *United States v. Graham*, 128 F.3d 372, 374 (6th Cir. 1997) ("[b]ecause the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner . . . the burden is on the prosecution to explain the cause of the pretrial delay.").

Reasons for delay generally fall into three categories: (1) compelling Government necessity in the face of a complicated prosecution, (2) lack of timeliness (or actual malfeasance) on part of the Government, and (3) delay caused by the defendant.  In order for this factor to weigh against the Government, no showing of bad faith or strategic delay is required.  In fact, negligence, overcrowded courts, and understaffed prosecutors' offices have been held against the Government because the ultimate responsibility for timely prosecution rests with the Government and not the defendant.  *See, e.g.*, *Strunk v. United States*, 412 U.S. 434, 436 (1973) (understaffed prosecutor's office is a neutral reason for delay that must still count against the Government).  Indeed, the Supreme Court in *Doggett* counted against the Government its negligence in making "no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes."  505 U.S. at 652-653.  In so holding, the Court explained:

> Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him.

*Id*. at 656-657.  In middle ground cases, "the weight assigned to the factor increases as the length of the delay increases." *United States v. Serna-Villarreal*, 352 F.3d 225, 232 (5th Cir. 2003).  On the other hand, the "speedy trial clock is properly tolled in cases where responsibility for the delay lies with the defendant rather than the state." *Nelson v. Hargett*, 989 F.2d 847, 852 (5th

12

Cir. 1993).

In this case, although the delay was not in bad faith or intended to hamper McCoy's defense, the Government has not brought forth a justifiable explanation. In fact, the evidence shows that the Government is plainly to blame for the passage of more than three years between McCoy's indictment and his trial date. The conduct underlying the offense in this case occurred nearly five years ago in June 2006. Although the nineteen months between McCoy's alleged illegal possession of a firearm and his indictment for that crime does not count toward the first *Barker* factor (the length of delay), the evidence regarding the events leading up to McCoy's indictment reveals that the Government is responsible for the difficulties it faced in locating McCoy.[2] Indeed, had the Government moved more expeditiously to indict McCoy, they would have easily located him at the Forest City, Arkansas, federal detention center where he was serving a sentence for violation of supervised release. Indeed, the Government was well aware of McCoy's location, as evidenced by the fact that Agent Gillis attempted to place a detainer on him there as soon as he was indicted. Although by the time nineteen months passed, McCoy had already been released, he was still detained at the federal detention center until approximately two months before his indictment. If the United States Attorney's Office had promptly reviewed the file and moved to indict McCoy even a few months earlier, it could have easily taken McCoy into custody and brought him to trial in a timely manner. The record shows that this pre-indictment delay was due to the United States Attorney's Office's negligence and/or the relatively low priority of the case. Indeed, the United States Attorney's Office first lost the case

---

[2] The time did not begin accruing for purposes of the first factor in the speedy trial analysis until January 23, 2008, the date McCoy was indicted for violating 18 U.S.C. § 922(g)(1). Although McCoy was arrested on June 27, 2006, the arrest was pursuant to the warrant for McCoy's violation of his supervised release, not for the firearm offense. Indeed, it was not until the agents arrested McCoy that they allegedly discovered the firearm in his possession. McCoy was not arrested or charged with any crime related to his alleged unlawful possession of a firearm until his indictment on January 23, 2008. (Affidavit of Blaine Gillis, Doc. No. 24.); *See Gravitt v. United States*, 523 F.2d 1211, 1215 n. 6 (1975) (speedy trial right did not attach on the date of arrest because defendant was arrested on state law charges not on the federal firearm charges he currently faced).

file and then changed personnel. The high case load of the AUSA who assumed the case also contributed to the delay. In fact, it is highly possible that McCoy would never have been indicted if not for the persistence of ATF Agent Gillis.

Even after McCoy's indictment, the Government's efforts to locate McCoy appear to be far from diligent. Certainly, there are several large gaps in the Government's investigative timeline. The record shows that the majority of the search efforts about which the law enforcement officers testified occurred in concentrated bursts between which little to no action was taken. Indeed, it appears that no active search efforts were undertaken from approximately August of 2008 to March of 2009 and from approximately June 2009 until McCoy was arrested in May 2010. Moreover, it appears McCoy was apprehended by local law enforcement on at least one occasion shortly after the warrant for his arrest was entered into NCIC, yet McCoy was released and the federal authorities were never notified.

Even after federal authorities located McCoy in state custody in May 2010, the governmental delay continued. Indeed, seven more months passed before federal authorities took McCoy into custody on the firearm charge. First, despite a federal detainer, the Texas state authorities failed even to notify the United States Marshals Service when McCoy was transferred to state prison. Then the United States Marshals Service allowed seven months to pass before following up to discover McCoy's whereabouts. Certainly, as soon as the United States Attorney's Office prompted Deputy Perusich to look into the matter on December 15, 2010, he successfully located McCoy, instituted a federal detainer, and took him into custody within two weeks. This presumably could have been accomplished months earlier.

As for the defendant, there is no evidence that he is responsible for any part of the delay. Nothing indicates that McCoy attempted to conceal his whereabouts between his indictment and

when the Government finally took him into custody in December 2010. To the contrary, he worked openly at two different jobs in 2009 and 2010 using his real name, and even filed income taxes. As discussed below, there is no evidence that McCoy knew he had been indicted and, thus, he would have had no reason to hide from the authorities.

The third factor in the speedy trial analysis is whether, and to what extent, the defendant asserted his speedy trial right. A defendant's "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532. For purposes of this factor, however, a defendant is not charged with asserting this right until he is notified of the pending charges. *See Doggett*, 505 U.S. at 653-654 (defendant not taxed for asserting speedy trial right only after arrest in the absence of evidence that he was aware of the charges previously). Here, as soon as McCoy was brought to court and notified of the pending indictment against him, he demanded a speedy trial. There is no evidence that McCoy knew about the indictment prior to December 2010 or that he attempted to evade attempts to locate him. Although Agent Beato spoke to McCoy's mother, Regina McCoy, and conveyed to her that McCoy had been indicted, there is no evidence that Regina McCoy shared this information with her son. In fact, she informed Agent Beato that she was unaware of her son's exact location. The Government has presented no evidence that McCoy was actually aware of the pending charge against him prior to December 2010, and therefore, he will not be taxed for not asserting his speedy trial right earlier. *See United States v. Cardona,* 302 F.3d 494, 498 (5th Cir. 2002) ("There is no evidence that [defendant] knew of the charges against him until his arrest; thus this factor weighs heavily in [defendant's] favor.")

The first three factors weigh heavily in McCoy's favor. The evidence reveals a significant delay of three years and that the Government's negligence is responsible for the

15

entirety of that period.  Although the blame for the delay is shared among several Government agencies, there is no indication that McCoy contributed to it in any way.  Because McCoy was apparently unaware that he had been indicted, his prompt assertion of the right to a speedy trial after being taken into federal custody in December 2010 also weights heavily in his favor.

In the final prong of the speedy trial analysis, courts assess any prejudice to the defendant caused by the delay.  "[U]nreasonable delay between formal accusation and trial threatens to produce more than one sort of harm . . . ."  *Doggett*, 505 U.S. at 654.  In *Smith v. Hooey*, the Supreme Court explained that the speedy trial clause of the Sixth Amendment is "essential to protect at least three basic demands of criminal justice in the Anglo-American legal system: '(1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation and (3) to limit the possibilities that long delay will impair the ability of an accused to defend himself.'"  393 U.S. 374, 377-378 (1969).  "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'"  *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532).  "Once triggered by arrest, indictment, or other official accusation . . . the speedy trial enquiry must weigh the effect of delay on the accused's defense . . . ."  *Id.* at 655.

"In applying a *Barker* balancing, the court must weigh the first three *Barker* factors-length of the delay, reason for the delay, and defendant's diligence in asserting his right-against any prejudice suffered by the defendant due to the delay in prosecution."  *Serna-Villarreal*, 352 F.3d at 230 (citing *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)).  "The first three factors should be used to determine whether the defendant bears the *burden* to put forth specific evidence of prejudice (or whether it is presumed) . . . ."  *Bergfeld*, 280 F.3d at 490 (emphasis in original).  Indeed, in some cases, the strength of the first three factors in defendant's favor can

relieve the defendant of the burden of having to show any specific prejudice. *See Doggett*, 505 U.S. at 655. In relieving *Doggett* of his burden to make an affirmative showing that the delay weakened his defense, the Supreme Court reasoned that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown."" *Id*. In *Doggett*, the Court held that, "[w]hen the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief." *Id*. at 658 (internal citations omitted).

The Court believes that the first three *Barker* factors weigh heavily in McCoy's favor. In *Barker*, the Supreme Court held that "[t]he only remedy for a violation of the right [to a speedy trial] is dismissal of the indictment." *United States v. Molina-Solorio*, 577 F.3d 300, 304 (5th Cir. 2009) (citing *Barker*, 407 U.S. at 522 (dismissal is a serious sanction, but it is the only possible remedy)). Because of the gravity of the required remedy, however, some courts have been reluctant to presume prejudice when the delay persisted for fewer than the six years found sufficient in *Doggett*. As the Fifth Circuit has stated, "In considering the length of a delay, this court has generally held that delays of less than five years are insufficient, by duration alone, to give rise to a presumption of prejudice and relieve the defendant of satisfying *Barker*'s fourth prong." *United States. v. Bishop*, 629 F.3d 462, 466 (5th Cir. 2010).

Certainly then, under Fifth Circuit precedent, a three year delay, by duration alone, would not be sufficient to presume prejudice. In this case, however, the Government manifested an inexcusable disregard for McCoy's constitutional right to a speedy trial through its carelessness and lack of diligence. "Bearing in mind that the *Barker* inquiry is a difficult and sensitive

17

balancing process, and a constitutional deprivation may be found without mechanical factor-counting,"[3] the Government's gross negligence, combined with the significant delay and McCoy's prompt assertion of his rights, weigh heavily in McCoy's favor such that he should be relieved of the burden of demonstrating actual prejudice. As the Supreme Court reasoned in *Doggett*:

> Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority. The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it.

*Doggett*, 505 U.S. at 657.

Even if prejudice were not presumed, McCoy has raised a sufficient degree of particularized prejudice to warrant the dismissal of the indictment against him. Indeed, in the absence of a delay sufficient to be presumptively prejudicial, courts consider the three interests that the speedy trial right was designed to protect to determine whether, in fact, the defendant has been prejudiced in one of these most critical ways.

In this case, McCoy argues that his ability to present a defense has been impaired by the significant passage of time and the resultant loss of any of the witnesses who could testify as to the events of his arrest and/or his state of mind when he was questioned by authorities. The *Barker* Court found that "[i]f witnesses die or disappear during a delay, the prejudice is obvious." 407 U.S. at 532. Here, it indeed appears that none of the witnesses present on the date of McCoy's arrest can be located due to the passage of nearly five years. Investigator Collins testified that the apartment building where the incident took place changed hands in 2008 and,

---

[3] *Molina-Solorio*, 577 F.3d at 307 (internal quotations omitted).

therefore, the names of those who gathered around to watch McCoy's arrest are undiscoverable. Nor is McCoy able to locate anyone who could testify as to his state of mind after ingesting mind-altering substances prior to giving an incriminating statement to law enforcement officers. Although the Fifth Circuit places the burden on the defendant to take steps to preserve witnesses' testimony for trial, no such burden is justifiable when the defendant, like McCoy, was unaware of any charges against him. *See Neal*, 27 F.3d at 1043.

The question is whether the prejudice McCoy identifies is sufficiently specific. The Fifth Circuit "has consistently held that speculative allegations, such as general allegations of loss of witnesses and failure of memories are insufficient to establish the requisite actual prejudice." *Avalos*, 541 F.2d at 1108. On the other hand, "consideration of prejudice is not limited to the specifically demonstrable." *Doggett*, 505 U.S. at 655. In this case, McCoy has not simply made speculative allegations that, over time, witnesses will disappear and memories will fade. Rather, McCoy points out that, in this particular case, the delay is actually responsible for his inability to mount a defense due to a total loss of witnesses—those that could testify as to the events surrounding his arrest and those who could shed light on whether he was competent when he gave a statement to law enforcement. The Court, therefore, concludes that McCoy has asserted prejudice with adequate specificity to warrant dismissal of the charge against him, even if prejudice were not properly presumed.

### III.  CONCLUSION

The first three factors of the *Barker* test weigh heavily in McCoy's favor. When considered together, their strength warrants the presumption of prejudice in this case. Even if prejudice were not presumed, McCoy has demonstrated actual prejudice that he faces in presenting a defense that results from the significant passage of time since his indictment.

Having found that McCoy's Sixth Amendment right to a speedy trial has been violated, his motion to dismiss is **GRANTED**.

    **IT IS SO ORDERED**.

    **SIGNED** at Houston, Texas, on this the 29th day of March, 2011.

    _____
    KEITH P. ELLISON
    UNITED STATES DISTRICT JUDGE